AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. **1:21-MJ-00530** |
| AN APPLE IPHONE CURRENTLY STORED IN A SECURE EVIDENCE ROOM AT THE FBI CINCINNATI FIELD OFFICE, LOCATED AT 2012 RONALD REAGAN DRIVE, CINCINNATI, OHIO 45236 | ) ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846; 18 USC §§ 924(c), 1503, 2232, & 371 | Possession with intent to distribute a controlled substance & conspiracy to commit a controlled substance offense; possession of a firearm in furtherance of serious drug offense; obstruction of justice; destruction of property to prevent seizure |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Eric McIntosh, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ **FaceTime Video** _____ *(specify reliable electronic means)*.

Date: _____ **Jul 9, 2021** _____

_____
*Judge's signature*

City and state: Cincinnati, OH

Stephanie K. Bowman, United States Magistrate Judge
*Printed name and title*

## <u>ATTACHMENT A</u>

The property to be searched is an Apple iPhone cellular telephone, in a clear and red protective case, with no further identifiers, hereinafter the "Device," as pictured below.  The Device is currently located in secure evidence storage at FBI Cincinnati, 2012 Ronald Reagan Drive, Cincinnati, Ohio 45236.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

  

## ATTACHMENT B

1.      All records and information on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (possession with intent to distribute a controlled substance and conspiracy to commit a Title 21 offense) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a serious drug offense) by Lamont WILLIAMS and others occurring on or about October 9, 2019 through the present, including but not limited to communications, photographs, videos, cell phone applications, and other data about the following:

  a. Any and all controlled substances (as defined under Title 21, United States Code, § 812) possessed by Lamont WILLIAMS and/or others in any form, including, but not limited to, fentanyl, methamphetamine, and cocaine;

  b. lists of customers and related identifying information;

  c. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

  d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

  e. any information recording Lamont WILLIAMS's schedule or travel from October 9, 2019 to the present;

  f. all bank records, checks, credit card bills, account information, and other financial records.

  g. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such

as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

h.    Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

i.    Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents).

j.    Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, §  841 and money wrappers, rubber bands, money containers, and money counting machines.

2

k.      Precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

l.      Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

m.      Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances.

n.      Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions.

o.      All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to:  personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys.

p.      Any and all electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking;

3

q.   Firearms and ammunition;

r.   Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

s.   Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

t.   Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

u.   Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

v.   United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

w.   Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes.

2.   All records and information on the Device described in Attachment A that relate to violations of 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. §§ 371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C. § 2232 (destruction or removal of property to prevent seizure); those violations involving Lamont WILLIAMS, and other

4

conspirators and occurring on or about May 4, 2021, through the present, including all communications and records, in whatever form they may be—whether they are electronic communications, audio recordings, photographs of physical communications or records, or otherwise, that contain evidence of Lamont WILLIAMS and/or other conspirators endeavoring to influence, obstruct, evade, impede, or otherwise interfere with the criminal investigation into Lamont WILLIAMS's drug trafficking crimes and possession of controlled substances and firearms on May 4, 2021.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE CURRENTLY STORED IN A SECURE EVIDENCE ROOM AT THE FBI CINCINNATI FIELD OFFICE, LOCATED AT 2012 RONALD REAGAN DRIVE, CINCINNATI, OHIO 45236** | **Case No.** <u>1:21-MJ-00530</u> |

<u>**AFFIDAVIT IN SUPPORT OF AN**</u>
<u>**APPLICATION UNDER RULE 41 FOR A**</u>
<u>**WARRANT TO SEARCH AND SEIZE**</u>

I, Eric J. McIntosh, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since August of 2003. My primary duties as a Special Agent consist of investigating criminal enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful possession and possession with the intent to distribute controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841, 843, and 846. I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the

associated violations of Title 18, United States Code, Sections 922 and 924. As part of my standard training to become a FBI Special Agent, I have received specialized training in the means and methods by which individuals and criminal enterprises conduct their illegal activities, as well as in the use of various investigative techniques used to uncover unlawful activities. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. I have received further specialized training concerning the interception of wire communications.

3.     I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers, and violent criminal enterprises. I am also familiar with, and have personally participated in, other normal methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, the use of pen registers, including pen registers in the form of digital analyzers, and the forensic analysis of cell phones and other electronic devices.

4.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.     The property to be searched is a locked Apple iPhone cellular telephone in a red and clear protective case, with no identifiers, as pictured in Attachment A, hereinafter the

2

"Device." The Device is currently located in secure evidence storage at the FBI Cincinnati Field Office, located at 2012 Ronald Reagan Drive, Cincinnati, Ohio 45236.

6.       The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

7.       The United States, including the FBI, is conducting a criminal investigation of Lamont WILLIAMS[1] regarding the following violations of federal law: possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, U.S.C., §§ 841(a)(1) and 841(b)(1)(A); possession of a firearm in furtherance of a serious drug offense, in violation of Title 18, U.S.C., § 924(c); obstruction of justice, in violation of Title 21, U.S.C. § 1503; conspiracy to commit obstruction of justice, in violation of Title 18, U.S.C. §§ 371 and 1503; and destruction or removal of property to prevent seizure, in violation of Title 18, U.S.C. § 2232 (collectively referred to as the "Subject Offenses"). Specifically, the FBI Cincinnati field office, Drug Enforcement Administration ("DEA") Dayton field office, Ohio Bureau of Criminal Investigation ("BCI"), Warren County Drug Task Force ("WCDTF"), and Drug Abuse Reduction Task Force ("DART") are investigating a Cincinnati area, poly-drug distribution network in which WILLIAMS has been identified as a member responsible for selling ounce quantities of fentanyl and pound quantities of methamphetamine.

---

[1] WILLIAMS's criminal history includes numerous felony arrests. During the course of this investigation, WILLIAMS had pending drug trafficking charges in state court.

**A. Law enforcement identified Lamont WILLIAMS as a drug trafficker during a months-long investigation that included controlled purchases from the WILLIAMS drug trafficking organization and electronic and physical surveillance.**

8.　　Beginning in January 2021 and continuing through March 2021, agents utilized confidential informants and a law enforcement officer, acting in an undercover capacity ("UC"), to conduct five controlled purchases of drugs from the WILLIAMS drug trafficking organization.　These controlled purchases resulted in the seizure of over 600 grams of methamphetamine, over 70 grams of acetylfentanyl, and over 40 grams of fentanyl.

9.　　In March 2021, agents and officers developed a Confidential Informant ("CI")[2] with direct knowledge of WILLIAMS' drug trafficking organization.　The CI provided officers with the cellular telephone number (513) 212-7815 as the telephone number the CI used to contact WILLIAMS to arrange drug transactions.　The CI stated WILLIAMS routinely "fronts" drugs and the CI would regularly obtain one-quarter to two-ounce quantities of fentanyl from WILLIAMS.　The CI indicated he/she has seen WILILAMS with one to two kilograms of fentanyl, pounds of methamphetamine, and pounds of cocaine in the past.　The CI said WILLIAMS drives rental cars that he changes frequently.　Based on my training and experience, I know that drug traffickers often use rental cars to conduct drug transactions in an effort to thwart law enforcement surveillance and prevent law enforcement from determining their true identity.

10.　　On or about March 29-30, 2021, the CI arranged to pay a drug debt owed to WILLIAMS for fentanyl "fronted" to the CI by WILLIAMS a few days prior.　During text

---

[2] The CI provided information to officers that had proven to be reliable and truthful.　The CI was cooperating with law enforcement due to pending federal criminal charges. Although no promises were made to the CI, the CI was motivated to cooperate with law enforcement in hopes of consideration during the prosecution of his/her federal criminal case. As of the date of this affidavit, the CI is no longer cooperating with law enforcement.

messages and a recorded FaceTime video call to (513) 212-7815, the CI and WILLIAMS agreed to meet at a parking lot in the area of Winton Road in Fairfield, Ohio[3]. Surveillance agents observed WILLIAMS, who was driving a dark blue Jeep Compass rental car bearing Ohio license plate HYX4973, park in the prearranged parking lot and meet with the CI who got into WILLIAMS' car. The CI provided WILLIAMS money owed for the prior fentanyl purchase and WILLIAMS told the CI that he (WILLIAMS) had additional fentanyl available any time the CI was ready.[4] After the meeting, the CI confirmed the individual he/she met with and paid the drug debt to was WILLIAMS.[5] Surveillance agents noted that WILLIAMS was the driver and sole occupant of the blue Jeep Compass.

11. On April 6, 2021, at approximately 8:00 AM, agents conducted a physical spot check surveillance in the Madisonville area of Cincinnati using court-authorized cell site location information for WILLIAMS' cellular telephone assigned call number (513) 212-7815. Agents located the dark blue Jeep Compass, bearing Ohio license plate HYX-4973 (a rental car known to be used by WILLIAMS), parked on the street in front of a single-family residence located at 5820 Roe Street, Cincinnati, Ohio.

---

[3] Agents witnessed the CI place text messages and conduct a FaceTime video call, which was audio recorded, to (513) 212-7815.

[4] This transaction was audio recorded.

[5] Law enforcement databases associate (513) 212-7815 with WILLIAMS. Agents showed the CI an Ohio driver's license photograph and a prior arrest booking photograph of WILLIAMS and the CI positively identified WILLIAMS as the individual he/she knows to sell drugs. Further, agents compared the individual they had observed on the aforementioned recorded FaceTime call and during surveillance of the meeting between the CI and WILLIAMS with WILLIAMS' driver's license photograph and determined them to be one and the same.

12.     On April 7, 2021, at approximately 9:00 AM, agents conducted surveillance near 5820 Roe Street, Cincinnati, Ohio.  Agents observed the dark blue Jeep Compass parked on the street in front of the house.  At approximately 12:15 PM, agents observed WILLIAMS exit the front door of the house, with keys and a cell phone in his hands, got into the driver's seat of the dark blue Jeep Compass, and departed the area, not followed by surveillance.

13.     On April 8, 2021, agents conducted surveillance near 5820 Roe Street, Cincinnati, Ohio.  Agents observed the dark blue Jeep Compass parked on the street in front of the house. At approximately 12:50 PM, agents observed WILLIAMS exit the front door of the house, get into the driver's seat of the dark blue Jeep Compass, and depart the area, followed by surveillance.  During the surveillance, WILLIAMS exited an interstate and began traveling on city streets.  After a short period of time, agents terminated surveillance in an effort to avoid WILLIAMS detecting a law enforcement presence.  Based on my training and experience, I know that drug traffickers often travel on city streets, making frequent turns and stops, in an effort to detect law enforcement surveillance.  Shortly after terminating surveillance, cell site location information for WILLIAMS' cell phone assigned call number (513) 212-7815 indicated WILLIAMS was in an area of Cincinnati known for a high level of drug trafficking activity.

14.     On April 27, 2021, at approximately 2:45 PM, agents conducted a spot check surveillance in the Lincoln Heights area of Cincinnati in response to court-authorized cell site location information for WILLIAMS's cell phone assigned call number (513) 212-7815. Agents located a brown GMC Terrain, bearing Florida license plate HKVQ43 (registered as a Hertz rental car), parked in the parking area of "Lamar's Lounge," 9568 North Wayne Avenue, Lincoln Heights, Ohio, a location known by local law enforcement to be associated with a high level of drug trafficking activity.

6

15. On April 28, 2021, at approximately 8:00 AM, agents established surveillance near 5820 Roe Street, Cincinnati, Ohio. Agents observed the brown GMC Terrain, bearing Florida license plate HKVQ43, parked on the street in front of the house. Based on my training and experience, I know that drug traffickers often use rental cars and change cars frequently to conduct drug transactions in an effort to prevent law enforcement from determining their true identity. I believe, based on my training and experience, that WILLIAMS rented the brown GMC Terrain to avoid detection by law enforcement during his drug trafficking activities.

16. At approximately 1:25 PM, agents observed WILLIAMS exit the front door of 5820 Roe Street, Cincinnati, Ohio. WILLIAMS got into the driver's seat of the brown GMC Terrain and departed the area, followed by surveillance. During the surveillance, agents noted WILLIAMS varied his speed, accelerating through a red light at a major intersection, a tactic commonly used by drug traffickers to avoid law enforcement surveillance. At approximately 2:13 PM, agents observed WILLIAMS standing outside of a store located at 2068 Central Parkway, Cincinnati, Ohio, speaking with an unidentified black male. Agents noted that WILLIAMS placed a white object in his right front pant pocket, then WILLIAMS and the unidentified subject got into separate vehicles and left the area. Based on my training and experience, I believe that this behavior is consistent with a hand-to-hand drug transaction.

17. Agents continued surveilling WILLIAMS as he made several turns on city streets, at one point turning and stopping on a dead-end street. Based on my training and experience, looping city blocks and stopping on residential streets is a common tactic used by drug traffickers to detect law enforcement surveillance. At this point, agents concluded surveillance in an effort to avoid WILLIAMS detecting a law enforcement presence. I believe, based on my training and experience, that WILLIAMS was employing counter-surveillance tactics

7

immediately following his interaction with the unidentified male, which further suggests that WILLIAMS had just engaged in a hand-to-hand drug transaction.

18.     As I described above, from April 2, 2021 to the present, agents began receiving court-authorized cell site location data for the cellular telephone assigned telephone number (513) 212-7815, known by investigators to be used by WILLIAMS.   The cell site location data showed that WILLIAMS resided overnight at 5820 Roe Street, Cincinnati, Ohio.  The cell site location data also showed that WILLIAMS travels throughout the day, frequently making stops at various locations throughout the Cincinnati area.  As noted above, physical surveillance of WILLIAMS confirmed his movements and whereabouts. Analysis of the cell site location data and of agents' physical surveillance suggest that WILLIAMS does not have any legitimate employment.

19.     Cell site location data for the cellular telephone assigned telephone number (513) 212-7815, known by investigators to be used by WILLIAMS, has shown WILLIAMS likely traveling to the Hollywood Casino in Lawrenceburg, Indiana.  Based on my training and experience, I know that drug traffickers will often visit casinos in an attempt to legitimize their cash profits from the drug trafficking trade.

20.     Cell site location data for the cellular telephone assigned telephone number (513) 212-7815, known by investigators to be used by WILLIAMS, also showed that WILLIAMS flew from Cincinnati to Los Angeles, California on or about April 14, 2021, returning on or about April 21, 2021.  Based on my training and experience, drug dealers often travel to southern California, a known source area for large scale drug traffickers, to arrange/broker large drug transactions with sources of supply.  Based on my training and experience, WILLIAMS'

8

activities observed by the cell site location data are consistent with those of an individual involved in drug dealing.

   **B.  On May 4, 2021, agents executed a federal search warrant at WILLIAMS' residence located at 5820 Roe Street, Cincinnati, Ohio 45227.**

   21.   Cell site location data for the cellular telephone assigned telephone number (513) 212-7815, known by investigators to be used by WILLIAMS, indicated WILLIAMS was at 5820 Roe Street, Cincinnati, Ohio, on May 4, 2021, when agents executed a federal search warrant. Agents had previously identified 5820 Roe Street as WILLIAMS's residence based on physical and electronic surveillance. Agents seized a black iPhone in a red and clear protective case from WILLIAMS's person at the time of his arrest, strongly suggesting that the cellular telephone seized was the same cellular telephone law enforcement was receiving court-authorized cell site location data for.

   22.   In addition to the cell phone I described above, the search of 5820 Roe Street, Cincinnati, Ohio 45227, resulted in the seizure of other items of evidentiary value, including the following: a Century Arms, Micro Draco 7.62 x 39 mm, semi-automatic AK47 pistol (Serial Number PMD-03318-16-RO), loaded with one round in the chamber; an attached magazine loaded with twelve rounds; three digital scales with narcotics residue; two blenders with narcotics residue; approximately 827 grams total packaged weight of a crystal-like substance that field-tested positive for methamphetamine; several smaller baggies of substances that field tested positive for methamphetamine, cocaine, and/or fentanyl; and approximately $20,000.  I know, based on my training and experience, that drug traffickers often use digital scales and blenders to prepare their drugs for sale. For example, traffickers will "cut" drugs by processing the drugs and a cutting agent in a blender. I believe, based on the quantity of drugs seized as well as the drug

9

residue detected on the scales and blenders, that WILLIAMS used the digital scales and blenders for this purpose. I also know, based on my training and experience, that the amount of drugs seized is consistent with drug trafficking, and not personal use. I also know, based on my training and experience, that drug traffickers frequently use firearms to further their drug trafficking business.

**C. At the time of his arrest on May 4, 2021, WILLIAMS had pending state charges in Ohio for drug trafficking.**

23.     In October 2019, the Florence, Kentucky Police Department and DEA Cincinnati were conducting an investigation in which WILLIAMS was identified as a source of supply for ounce quantities of fentanyl.    During the investigation, agents and officers learned that WILLIAMS and his girlfriend were shot multiple times on October 9, 2019 by unknown subjects as WILLIAMS and his girlfriend were walking into their house, located at 409 Locust Street, Cincinnati, Ohio.    Officers responding to the shooting located narcotics in WILLIAMS's residence, secured the scene, and obtained a search warrant for the residence.    Among items agents seized were drug paraphernalia, approximately 113 grams of fentanyl, and a firearm. The state of Ohio charged WILLIAMS with drug trafficking in Hamilton Court of Common Pleas case number B2002897-B.

24.     I believe, based on my training and experience, and my knowledge of the investigation to date, including additional information I address below, that WILLIAMS continued to engage in drug trafficking after his arrest in October 2019 through his arrest on May 4, 2021. I know that WILLIAMS has not had legitimate employment during that time frame, and that his criminal history shows a consistent pattern of drug trafficking. I further believe that to

continue dealing drugs, WILLIAMS needed to use a cellular phone, such as the Device seized from his person incident to his arrest.

**D.  Agents also searched WILLIAMS's mother's car and residence on May 4, 2021.**

25.     While agents were searching WILLIAMS's home on May 4, 2021, other agents simultaneously conducted surveillance of WILLIAMS's mother's house, located at 1825 Sutton Avenue. WILLIAMS's mother, T.D.,[6] got into her car with a bag just after SWAT had surrounded WILLIAMS's house, suggesting that WILLIAMS called his mother as soon as he realized the police were there. Agents conducted a traffic stop on T.D. During the traffic stop, T.D. gave inconsistent and vague answers regarding her destination.  She agreed to let agents search her car, where they found a drug ledger. Agents noted the drug ledger contained notations consistent with drug weights—for example, "g" for grams—and corresponding dollar amounts that are consistent with the street value of narcotics in the amount noted. Because of these observations, I believe, based on my training and experience, that the ledger seized from T.D. was in fact a drug ledger that reflected the amount of drugs being sold, and the amount of money owed or paid for the drugs. T.D. said the handwriting in the drug ledger belonged to WILLIAMS or WILLIAMS's girlfriend.

26.     T.D. told officers that WILLIAMS keeps things at her house and consented to a search of the Sutton Avenue address. During their search, agents recovered a Phoenix Arms .25 caliber pistol, serial number 4439101, model number MP25A, with one round in the chamber and eight rounds in the magazine; several pills; 23 grams of suspected LSD; 23.2 grams of

---

[6] Because this individual is not presently charged with a crime, I am using her initials to protect her privacy.

suspected crack cocaine; 33 grams of suspected fentanyl; and two digital scales with residue. T.D. told agents that the Phoenix Arms pistol belonged to WILLIAMS.

27.    I believe, based on my training and experience, that the drug ledger, firearm, and drugs seized from T.D.'s car and house on May 4, 2021 are consistent with drug trafficking.

**E.  After he was arrested, WILLIAMS placed several calls from jail in an attempt to hide evidence.**

28.    In a series of recorded jail calls from on or about May 5, 2021 through May 6, 2021, WILLIAMS called the same phone number[7] and instructed his mother, T.D., to return to his house and get his green jacket and further instructed her, in coded language, to check the dryer vent in the basement. At the time of these phone calls, WILLIAMS was only aware that agents had seized $10,000 from the attic; the criminal complaint made no mention of the money in the green jacket—approximately $10,000— so WILLIAMS thought officers missed it during the search. In subsequent phone calls T.D. told WILLIAMS that they're "good on the dryer" but that they could not find the green jacket.

29.    After hearing these calls, I reached out to T.D. via phone to recover the items she had taken from WILLIAMS's house. T.D., through her attorney, agreed to return the drugs to the FBI. T.D. and her counsel went to the FBI Field Office on May 10, 2021, where T.D., through her attorney, provided me with approximately three ounces of marijuana.

30.    Based on my training and experience, and my knowledge of the case to date, I do not believe that T.D. recovered marijuana from WILLIAMS's dryer vent. The controlled

---

[7] To protect the privacy of uncharged individuals, I am not including the phone number WILLIAMS dialed.

substances agents recovered from WILLIAMS's house did not include substantial amounts of marijuana. Three ounces of marijuana has a de minimis street value, and the risk WILLIAMS took in speaking in code in a recorded jail phone to his mother suggests that the narcotics and/or other items he kept in the dryer vent were very valuable and/or incriminating. For these reasons, I believe WILLIAMS's and T.D.'s conspiracy to obstruct the criminal investigation into WILLIAMS's drug trafficking is ongoing based on T.D.'s representation that she took only three ounces of marijuana from WILLIAMS's house in response to WILLIAMS's instructions.

### F. I believe the Device contains evidence relevant to the ongoing investigation into WILLIAMS's criminal activities.

31.     I believe, for the reasons I described above, as well as for the additional reasons I give below, that the Device will contain evidence related to WILLIAMS's drug trafficking and efforts to thwart law enforcement's investigation into his drug trafficking. Based on my training and experience, as well as my discussions with other law enforcement agents, I know the following:

a)     Drug dealers often maintain documents pertaining to the possession, importation, exportation, and/or distribution of controlled substances and illegal proceeds, including invoices, shipping labels, tracking numbers, boxes, and envelopes at their residences, stash houses, and/or in their vehicles where they are available for reference and concealed from law enforcement; and it is common to find photos or other records relating to these items on an electronic device used;

b)     It is also common to find on drug dealers' smart phones photos or other records relating to the following common practices of drug dealers:

i.     Drug dealers commonly store drugs and drug paraphernalia, including

pipes, syringes, and rolling papers, in their residences, stash houses, and/or vehicles in order to have ready access to the drugs and/or paraphernalia in order to conduct their drug dealing business or to use those drugs personally;

ii.     Drug dealers attempt to mask the distinct odors of particular drugs through the use of heat sealing and/or canning devices and/or aromatic substances such as laundry soap, dryer sheets, air fresheners, or axle grease;

iii.    Drug dealers often dilute, or "cut," drugs in order to maximize the volume of drugs they have to sell, and thus their profits. Drug dealers use various substances to dilute drugs, including mannitol, mannite, lactose, Vitamin B12, and MSM. Drug dealers use equipment, such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors and kilo or pound presses as part of the dilution or "cutting" process. Once the drug has been "cut," drug dealers usually will repackage it, often in smaller quantities, using masking agents, tape, heat sealers and heat sealed bags, ziplocs bags, paper bindles, and/or other containers for redistribution. It is common for drug dealers to maintain such equipment and supplies in their residences and stash houses;

iv.    Drug dealers keep books, receipts, notes, ledgers and other forms of records specifically relating to their drug distribution activities. Because drug dealers often "front" drugs to their customers – that is, sell the drugs on credit – or receive drugs from their suppliers on credit, such documentation is necessary to keep track of the amounts paid and owed

14

with respect to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets" and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets, and are frequently encoded in order to protect those involved. Drug dealers often keep such records on their person or in their residences, stash houses, and/or vehicles;

v.  Drug dealing is a cash business. Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash. Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances. When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement. To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug dealers also purchase real estate or vehicles, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug dealers often utilize fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales. In addition, drug dealers often use wire

15

transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business. Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available.

vi. Drug dealers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business. This is to safeguard those items against robbery and keep them from law enforcement. These secure locations typically include safes, vaults, or other locked containers, as well as specially constructed concealed compartments such as those often found in vehicles used specifically to facilitate drug dealing. Other methods of concealment include the burial of such items underground, the use of locked vehicles, trailers, out buildings, sheds, and/or exterior closets, the use of natural spaces within walls, furniture, vehicles, and other areas, and the use of sealed cans and canning machines;

vii. Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States. They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another. They often use hand-written airbills, drop the packages near closing time,

pay for such services in cash and utilize false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or in their vehicles where they are available for reference.

viii. Drug dealing is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package and deliver the drugs and persons to launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, pager numbers, facsimile numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained on their person or in their residences, stash houses, and/or vehicles, so they are readily available in order to efficiently conduct their drug dealing business. Moreover, such records are often stored electronically within the memory of telephones, computers, and/or personal digital assistants such as iPhone and Blackberry devices;

17

ix.  Drug dealers often use cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and/or personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug dealers often keep these items on their person or in their residences, stash houses, businesses, and/or vehicles where they are readily available;

x.  Drug dealers often travel by car, bus, train, or airplane, both domestically and to and/or within foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, or to transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline ticket and baggage stubs, frequent use club membership information and records associated with airlines, rental car companies, and/or hotels, airline, hotel and rental car receipts, credit card bills and receipts, photographs, videos, passports, and visas, are often maintained by drug dealers in their residences, stash houses, and/or vehicles where they are readily available for use or reference;

xi.  Drug dealers frequently possess firearms, ammunition, silencers, explosives, incendiary devices, and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take such items and/or harm them during transactions. Such weapons, which are often stolen or otherwise possessed illegally, are typically maintained on their

18

person or in their residences, stash houses, and/or vehicles where they are concealed from law enforcement and readily available;

xii. Drug dealers often utilize two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement, and that such items are typically maintained at their residences, stash houses, and/or in their vehicles.

xiii. Drug dealers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs; and such items are often stored on their person, in their residences, and/or vehicles;

xiv. During the course of a search it is not uncommon to find items of personal property that tend to identify the person(s) in residence occupancy, control, or ownership of the place being searched vehicle, such as cancelled mail, deeds, leases, titles, registration information, rental agreements, photographs, videos, diaries, utility and telephone bills, tax documentation, travel documents, statements, passports, driver's licenses and/or identification cards, immigration documentation, birth certificates, and keys.

xv. I know that drug dealers often use their vehicles to transport contraband – including drugs, drug proceeds and firearms – and other evidence of their activities. I know that following a drug trafficker's movements can facilitate surveillance and enable agents to follow a subject without exposing themselves to the subject they are following. This in turn enables agents to observe a drug trafficker's meetings with other associates and learn about new

19

locations where a DTO stores drugs, money, firearms and other items related to the manufacture and distribution of controlled substances.

32.     I also believe, based on T.D.'s movements during the morning of the search, that WILLIAMS notified T.D. by phone of the imminent police presence in WILLIAMS's home. T.D.'s behavior and the subsequent search of T.D.'s house suggests that WILLIAMS and T.D. were in communication with regards to drug trafficking, and that WILLIAMS asked T.D. to do something for him the morning of the search of the Roe Street house. As I explained above, WILLIAMS continued to communicate with T.D. from jail regarding evidence pertinent to the drug trafficking investigation. I also believe that the Device likely contains the phone number WILLIAMS dialed from jail when he spoke to T.D. to instruct T.D. to remove and/or destroy evidence at his house, and that the contact name that phone number is saved under will be evidence of the relationship between the conspirators.

33.     The Device is currently in the lawful possession of the FBI.  It came into the FBI's possession in the following way:  seized incident to a federal search warrant for the premises located at 5820 Roe Street, on May 4, 2021. At that time agents also arrested WILLIAMS, who resides at the Roe Street address and who was home when agents executed the search warrant. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

34.     The Device is currently in secure evidence storage at FBI Cincinnati, 2012 Ronald Reagan Drive, Cincinnati, Ohio 45236.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this

20

investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## **TECHNICAL TERMS**

35.    Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved

22

in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

23

36.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at www.apple.com, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

38.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

     a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

25

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

41. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

//

//

//

//

//

//

//

//

//

26

## **REQUEST FOR SEALING**

42.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Eric J. McIntosh
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me **via electronic means, specifically Facetime video.**
On July 9 , 2021.

STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

27

## <u>ATTACHMENT A</u>

The property to be searched is an Apple iPhone cellular telephone, in a clear and red protective case, with no further identifiers, hereinafter the "Device," as pictured below. The Device is currently located in secure evidence storage at FBI Cincinnati, 2012 Ronald Reagan Drive, Cincinnati, Ohio 45236.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

  

## ATTACHMENT B

1.     All records and information on the Devices described in Attachment A that relate to violations of 21 U.S.C. §§ 841 and 846 (possession with intent to distribute a controlled substance and conspiracy to commit a Title 21 offense) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a serious drug offense) by Lamont WILLIAMS and others occurring on or about October 9, 2019 through the present, including but not limited to communications, photographs, videos, cell phone applications, and other data about the following:

        a.     Any and all controlled substances (as defined under Title 21, United States Code, § 812) possessed by Lamont WILLIAMS and/or others in any form, including, but not limited to, fentanyl, methamphetamine, and cocaine;

        b.   lists of customers and related identifying information;

        c.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

        d.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

        e.   any information recording Lamont WILLIAMS's schedule or travel from October 9, 2019 to the present;

        f.   all bank records, checks, credit card bills, account information, and other financial records.

        g.   Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such

as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

h.    Paraphernalia associated with the manufacture, distribution, sale, import, export, storage, conversion, preparation for sale and use of any controlled substances, including scales, measuring devices, bottles, balloons, baggies, plastic wrap, plastic envelopes, film canisters and cutting, conversion, and adulteration agents.

i.    Records showing evidence of importing, smuggling, and distributing drugs, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOU's, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, express consignment mailing labels (including Federal Express, DHL, U.S. Postal Express Mail, UPS, and other similar labels), evidence of offsite storage (such as storage locker receipts and safety deposit box rental records and keys), documents showing domestic or international travel (such as airline tickets, itineraries, passports, and the like), and receipts showing imports or exports (such as shipper's export declarations, bills of lading, invoices, tax identification number paperwork, and other similar documents).

j.    Currency (whether U.S. or foreign) and financial instruments, including travelers checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders, derived from the sale of controlled substances in violation of Title 21, United States Code, § 841 and money wrappers, rubber bands, money containers, and money counting machines.

2

k.     Precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

l.     Any and all records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other high-value items that could be obtained with the proceeds of the sales of controlled substances.

m.     Any boxes, bags, briefcases, suitcases, containers, or other items that could be used to mail, carry, import, export, smuggle, or transport marijuana or any other controlled substances.

n.     Photographs (both paper and digital form) and video and audio recordings which document an association with other co-conspirators and/or display drug trafficking methods, narcotics, firearms, or money and proceeds from narcotics transactions.

o.     All records, documents, and materials showing control, possession, custody, dominion or other indicia of occupancy over physical premises, including but not limited to:  personal mail, checkbooks, personal identification, personal effects, notes, other correspondence, utility and other bills, internet service provider documents, letters, rent receipts, mortgage and loan documents, financial documents, vehicle registration information or ownership warranties and keys.

p.     Any and all electronic or communication devices including, but not limited to, cellular telephones, smart phones, portable electronic devices such as tablet computers, laptops, iPads or electronic storage media, and other electronic or communication devices which could be used to facilitate drug trafficking;

3

q.   Firearms and ammunition;

r.   Firearms accessories, such as ammunition, ammunition magazines, silencers, gun cases, magazines and spare parts;

s.   Firearms source records, including lists of prices, correspondence, notation logs, receipts, journals, books, telephone records, telephone bills, address books, bank statements, and other documents or devises noting the price, quantity, dates, and/or times when firearms were purchased possessed, transferred, distributed or sold;

t.   Photographs, video and audio recordings, text messages, chats, emails and other communications (and associated contact information), in electronic or other form, related to the possession, acquisition or transfer of firearms, firearms parts and accessories, or ammunition;

u.   Firearms boxes, manuals, and receipts or other paperwork related to firearms transactions;

v.   United States currency or other items of value representing the proceeds of firearms trafficking and/or drug trafficking;

w.   Documents pertaining to the importation of firearms and/or ammunition and proceeds derived from the sale therefrom, including invoices, shipping labels, tracking numbers, boxes, and envelopes.

2.   All records and information on the Device described in Attachment A that relate to violations of 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. §§ 371 and 1503 (conspiracy to commit obstruction of justice); 18 U.S.C. § 2232 (destruction or removal of property to prevent seizure); those violations involving Lamont WILLIAMS, and other

4

conspirators and occurring on or about May 4, 2021, through the present, including all communications and records, in whatever form they may be—whether they are electronic communications, audio recordings, photographs of physical communications or records, or otherwise, that contain evidence of Lamont WILLIAMS and/or other conspirators endeavoring to influence, obstruct, evade, impede, or otherwise interfere with the criminal investigation into Lamont WILLIAMS's drug trafficking crimes and possession of controlled substances and firearms on May 4, 2021.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.